## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **PRODIGY DISC, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **FILE NO.** |
| **G.B., a Minor, by and through** | ) | |
| **Michelle Nesheim, his Legal** | ) | **JURY TRIAL DEMANDED** |
| **Guardian,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DECLARATION OF MARK ANDERSON

1.      My name is Mark Anderson.  I am over the age of 18 years and am competent to testify regarding the matters contained herein.  I have personal knowledge of the matters stated herein and know them to be true.

**A. My Background and Role at PDI.**

2.      I have been playing disc golf since 1981 and have been a member of disc golf's governing body, the Professional Disc Golf Association ("PDGA"), since 1984.

3.      When an individual joins the PDGA, he or she is assigned a PDGA number that signifies his or her seniority within the organization.  The lower the

number, the longer a person has been a PDGA member.  Ed "Steady" Headrick, widely considered the Father of Disc Golf, was the PDGA's first member and is PDGA No. 1.  If an individual were to join the PDGA today, his or her PDGA number would be somewhere between 247,000 and 248,000.

4.      My PDGA No. is 2614, which places me just outside the top 1 percent of the PDGA's membership in terms of seniority.

5.      After a well-traveled career in technology and investment banking, I met with the team at PDI in 2021 to discuss making an investment.  After several months of discussions, in March 2022, I ended up joining PDI as a member of the Board of Directors and the Chief Executive Officer, roles in which I currently serve.

6.      Founded in 2012, PDI manufactures and sells golf discs and other related products, such as towels, bags, markers, and apparel engineered to meet the technical needs of disc golfers.

**B. PDI's Core Team.**

7.      A key component of PDI's marketing campaign entails engaging with professional disc golfers to market, distribute, and endorse PDI products.  As part of my duties and responsibilities as CEO, I am actively involved in growing and maintaining relationships with the athletes we engage, monitoring sales of athlete-

endorsed PDI products, and negotiating PDI's endorsement contracts with these athletes.

8.     We focus our marketing and endorsement efforts on our "Core Team," which consists of ten professional disc golfers that compete in Disc Golf Pro Tour ("DGPT") events across the country.  The DGPT is the highest level of competition in professional disc golf.

9.     The DGPT season typically commences at the end of February and concludes with the DGPT Championship in October.  Although the 2023 DGPT season does not officially begin until February 23 in Las Vegas, many top DGPT disc golfers are scheduled to compete in the DGPT All-Star Weekend this coming weekend, February 17-19, in Tucson, Arizona.

**C. PDI's Years-Long Relationship with G.B.**

10.     PDI became G.B.'s exclusive sponsor in 2016.  Because G.B. was just eleven years old when PDI began sponsoring him, his mother, Michelle Nesheim, has played a pivotal role in PDI's relationship with him.  Over the years, all of PDI's business discussions and contract negotiations with G.B. have involved Nesheim, who has acted as his representative and consented to and agreed to all business dealings between PDI and her son.

11.     When PDI began sponsoring G.B. in 2016, he was just a talented kid with a lot of promise.  Although PDI had high hopes for him, PDI still took a significant risk in sponsoring an eleven-year-old kid.

12.     Until a few weeks ago, PDI's years-long investment in G.B. was primed to pay off in a massive way, as G.B. has developed into one of the best disc golfers in the world.  According to the PDGA's U.S. Tour Rankings, he is the fourth best disc golfer on the United States Tour.[1]

13.     G.B.'s biggest career accomplishment to date came last October, when he became the youngest person ever to win the 2022 United States Disc Golf Championship ("USDGC"), one of the most prestigious tournaments in disc golf.[2] Winning the USDGC is the equivalent of a professional golfer winning the U.S. Open.

14.     Before winning the 2022 USDGC, G.B. was named the 2021 PDGA Rookie of the Year.  Before that, he won two PDGA Junior World Championships.

---

[1] *See* https://www.pdga.com/united-states-tour-ranking (last visited Feb. 14, 2023).

[2]     *See Making History: [G.B.] Wins 2022 USDGC, available at* https://tinyurl.com/5n6anpz7 (last visited Feb. 15, 2023).

4

**D. PDI's Current Contract with G.B..**

15.     Over the years, PDI has had several contracts with G.B., which have always been negotiated through Nesheim.

16.     On January 1, 2022, PDI and G.B. entered into the two-year contract that is the subject of this lawsuit, the Endorsement Agreement.  The Endorsement Agreement grants PDI the exclusive right and license to use G.B.'s name, image, and likeness in connection with the promotion and sale of PDI products in exchange for agreed upon compensation.  It also prohibits G.B. from promoting, endorsing, or advertising any products manufactured by PDI's competitors that compete with the products manufactured, imported, and/or distributed by PDI and our affiliates.  A true and correct redacted version of the Endorsement Agreement is attached hereto as **Exhibit 1**.

17.     Up until the end of G.B.'s 2022 record-breaking season, I believed that G.B. was pleased with the state of his relationship with PDI.  Speaking on behalf of PDI, I can say that we were extraordinarily pleased with our relationship with him.

18.     Shortly after the season ended, I served as ██████'s caddie for multiple rounds of disc golf and had multiple dinners with him and Nesheim.  At no point over the course of my several days spent with them did either of them indicate they

were unsatisfied with the Endorsement Agreement or with G.B.'s relationship with PDI in any way.

**E. G.B. Expresses Displeasure with the Endorsement Agreement.**

19.     Unfortunately, things began to change shortly thereafter.  In November 2022, I received a call from Nesheim asking if PDI would be willing to release G.B. from the Endorsement Agreement, which runs through December 31, 2023. Nesheim told me she believed that G.B. may "do better" if he were under contract with one of our bigger competitors.

20.     Nesheim's request to release G.B. from the Endorsement Agreement came as a shock to me as it was completely unprovoked and cited no issues or grievances with PDI's performance under the Endorsement Agreement.  Before November 2022, I was unaware of any issues G.B. or Nesheim had with PDI or the Endorsement Agreement.

21.     I informed Nesheim that PDI would not be able to oblige her request.  I did, however, suggest that we could discuss a renegotiation of G.B.'s current terms if she could let me know what the issues were.  At the time, she did not identify any specific issues with the Endorsement Agreement.

22.     After this inquiry, we wanted to continue showing G.B. our support of him as a PDI sponsored athlete and engaged in discussions to renegotiate the terms

of his current deal. PDI was willing to extend the length of the Endorsement Agreement and provide G.B. a significant increase in compensation, and I spent a considerable amount of time and effort piecing together an enhanced compensation package that PDI could offer G.B..

23.     G.B. and his mother did not seem interested when I conveyed PDI's desire, and instead deemed it best just to play out the remainder of the 2023 disc golf season.  At that point, I believed the matter to be resolved.

**F. G.B. Expresses Intent to Terminate the Endorsement Agreement.**

24.     Suddenly, on January 13, 2023, I received an email from G.B. threatening to terminate the Endorsement Agreement and citing what he deemed to be five "Material Breaches" of the Endorsement Agreement (the "Termination Notice").  A true and correct copy of this Termination Notice is attached hereto as **Exhibit 2**.

25.     The five "Material Breaches" G.B. specified in the Termination Notice included:

    a.  G.B.'s complaint that he should have received a disc celebrating his 2021 PDGA Rookie of the Year award in early 2022.

b.  G.B.'s complaint that he and his mother were not receiving "regular sales reports" of his disc sales to reconcile with the commissions that PDI pays him.

c.  G.B.'s complaint that he "did not get the opportunity" to choose which disc he preferred as his signature series disc in early 2022.

d.  G.B.'s complaints about the alleged deficient nature of PDI's products.

e.  G.B.'s complaint that he had not been paid $500 in bonuses that he was owed from the 2022 season.

26.  The Endorsement Agreement defines a "Material Breach" as a breach that "includes, without limitation, non-payment of compensation by PDI, [G.B.]'s failure to provide any of the endorsement services set forth [in the Endorsement Agreement], either party's failure to fulfill any of its obligations [under the Endorsement Agreement], [G.B.]'s commission of any criminal act, and [G.B.]'s commission of any act which shocks or offends the community or which manifests contempt or disregard for public morals and decency."

27.  The Endorsement Agreement provides that either PDI or G.B. may only terminate the Endorsement Agreement for cause if (a) there is a Material Breach, as defined in the Endorsement Agreement; and (b) the breaching party fails to cure the breach within thirty days of receiving written notice of a Material Breach from the

8

non-breaching party.   G.B.'s Termination Notice threatened to terminate the Endorsement Agreement in 30 days if the purported Material Breaches "ha[d] not been cured."

28.   While we were disappointed to receive the Termination Notice, we still wanted to try to work out an agreement with G.B. in an effort to placate his requests and maintain a working business relationship.  I asked G.B. what he was seeking in terms of renewed compensation.  After these discussions, we made a proposal to G.B. that included a compensation package that would approximately quadruple the compensation package of his current deal.  G.B. and Nesheim requested a couple of days to consider our offer.

29.   While I was attempting to renegotiate the Endorsement Agreement with G.B. and his mother, I began receiving information from others in the professional disc golf industry that G.B. and/or Nesheim were engaged in conversations with other disc golf manufacturers regarding endorsement agreements with PDI's competitors.  It was unclear from this information whether PDI's competitors were contacting G.B. and Nesheim, or vice versa.

30.   A few days after extending our new offer to G.B., we still had not received a response.  It appeared to me that G.B. only pretended to be interested in

these renegotiation discussions but was not seriously considering what we believed to be a generous new deal.

31.     Because it appeared to me that G.B. was unphased or uninterested by PDI's latest offer to him, we opted to have our counsel respond to the Termination Notice.  A true and correct copy of our response to the Termination Notice is attached hereto as **Exhibit 3**.

**G. G.B. Terminates the Endorsement Agreement.**

32.     On February 13, 2023, we received a letter from an attorney engaged by G.B. stating that G.B. was terminating the Endorsement Agreement, effective immediately (the "February 13 Termination").  A true and correct copy of the February 13 Termination is attached hereto as **Exhibit 4**.

33.     Later that day, I saw a post on G.B.'s Instagram page where he announced he was leaving PDI.[3]  G.B.'s announcement came as a surprise to the disc golf world as many media outlets covering the sport and fans commenting online expressed their shock and speculated as to the reason for G.B.'s announcement.

34.     Attached hereto as **Exhibit 5** is a compendium of news articles, online comments, and social media posts demonstrating the public's reaction to G.B.'s

---

[3] *See* https://www.instagram.com/reel/Com6QDpr5PH/ (last visited Feb. 15, 2023).

announcement.  Many pundits commented that PDI could not match offers made to G.B. by our competitors.  We do not believe this to be the case because G.B. never provided us with any offers he received from competitors, as he is required to do under the Endorsement Agreement.

**H. PDI Never Materially Breached the Endorsement Agreement.**

35.    G.B.'s announcement that he is leaving PDI has been especially frustrating because PDI never materially breached the Endorsement Agreement.

36.    In the Termination Notice, G.B. complained about not receiving a disc celebrating his 2021 PDGA Rookie of the Year award. The truth is that PDI made a disc commemorating this award in both our "400 series" and our "500 series."  Both are stamped with G.B.'s signature and clearly identify him as the "2021 PDGA Rookie of the Year:" Set forth below is a true and correct representation of the 400 series and the 500 series discs:





37.    Both discs of this commemorative disc are publicly available on our website to this day.

38.     While I understand G.B. believes he was entitled to a disc commemorating his 2021 Rookie of the Year Award, nothing in the Endorsement obligated us to do so, yet we still did it anyway.  We also created two other discs commemorating G.B.'s accomplishments.  One commemorated his first DGPT win; the other commemorated his status as the top putter on the DGPT in 2022.  Set forth below is a true and correct representation of these two discs, neither of which we were obligated to create but did so anyway:





39.     In the Termination Notice, G.B. also complained that he and his mother were told they would be able to view "regular sales reports" of his disc sales to reconcile with his PDI commissions.   Put simply, nothing in the Endorsement Agreement obligates PDI to provide G.B. with "regular sales reports."

40.     G.B.'s complaint that he "did not get the opportunity to choose which disc [he] preferred" for his signature series disc is also without merit.  PDI repeatedly asked for his input on "the D1," his signature disc.  G.B. also repeatedly expressed his approval of the D1, at one point commenting to my colleague Michael Sullivan that he had received "the D1s" and that "the stamp looks sick and the colors are awesome."  He also boasted that they "feel awesome."  A true and correct copy of a

portion of G.B.'s February 2022 iMessage exchange with Mr. Sullivan is attached hereto as **Exhibit 6**.

41.     Although PDI did in fact consult with G.B. on what his signature disc would look like, nothing in the Endorsement Agreement obligated it to do so.

42.     As to G.B.'s complaints about the supposedly deficient nature of PDI's products, G.B. never once complained to PDI about product quality over the course of the six-year relationship until November 2022, when Nesheim suddenly inquired about terminating the Endorsement Agreement.

43.     Time and again, G.B. (through Nesheim) agreed to contract extensions with PDI and G.B. repeatedly expressed his satisfaction with the quality of PDI's products.

44.     G.B.'s final complaint in the Termination Notice that he did not receive $500 in bonuses for his 2022 PDGA season is also not a Material Breach.  And even if it were, PDI has cured it.  G.B.'s counsel has admitted just as much.

45.     On January 30, 2023, PDI sent G.B. a payment that included the $500 he was admittedly owed.  On February 4, I personally confirmed with G.B. that he had received this amount.  Thus, to the extent not paying G.B. $500 in bonuses constituted a breach at all, PDI cured it by paying G.B. that amount (which he accepted) within 30 days of the Termination Notice.

46.    To date, PDI has paid G.B. all amounts that he is owed under the Endorsement Agreement.

## I. The Extremely Harmful Impact of Losing G.B. to One of Our Competitors.

47.    I strongly expect that G.B. intends to sign a sponsorship agreement with one of PDI's competitors, perhaps as soon as February 16, 2023.  Losing G.B. to one of our competitors would be devastating to our business.

48.    In terms of sales figures alone, I estimate that PDI would lose up to $1.5 million in sales without G.B. under contract through the end of 2023.

49.    But the impact of losing G.B. to one of our competitors would go far beyond sales figures.  Already, PDI's brand is suffering in the marketplace.  Many consumers suspect that something is "wrong" with PDI because G.B. has announced that he will no longer be affiliated with the brand after we proudly announced *last month* that he would be part of our Core Team for 2023.  At the time, G.B. himself expressed his excitement to be part of PDI's Core Team, posting on January 11, 2023 "Let's get it!" on his publicly-available Instagram page that is followed closely by disc golf fans:



50.    One prominent disc golf commentator wrote in recent days that, although "[r]umors had swirled around [G.B.]'s departure [from PDI] earlier in the offseason, . . . [PDI]'s announcement of [G.B.] as a part of their sponsored team last month seemed to put those rumors to bed."[4]  I had thought so too.

---

[4] *See [G.B.] Announces Departure from Prodigy Sponsorship*, Ultiworld Disc Golf, Feb. 13, 2023, *available at* https://tinyurl.com/58ek5djb

(last visited Feb. 15, 2023).

51.     One social media post that has surfaced in recent days and has been particularly troubling and worrisome to me is a "meme" of PDI's logo on a tombstone with G.B.'s smiling face photoshopped on a body standing over the gravesite, indicating G.B.'s departure would essentially destroy PDI's business:



52.     Unfortunately, this "meme" may not be all that far-fetched, as PDI is undoubtedly going to endure significant business hardship due to G.B.'s conduct.  I am unable to calculate exactly pecuniary losses his departure will do to PDI, but as already demonstrated by the public commentary since his announcement, PDI's reputation in the industry will severely suffer, perhaps catastrophically.

53.    G.B.'s departure would also leave PDI without a high-profile PDGA athlete under contract for the quickly-approaching 2023 season.  Knowing that PDI would need additional resources for a contract extension with G.B. going into the 2023 season, we made the conscious decision to forego sponsorship opportunities with other athletes.  At this point, it is too late to sign another disc golfer for the 2023 season that begins next weekend.

54.    If G.B. were to sign an endorsement deal with one of our competitors, the harm would be devastating.  Not only would we be losing significant amounts of sales revenue, all of that revenue would be going directly into the pockets of one of our competitors.

55.    Put simply, losing G.B. to one of our competitors, especially when we passed up other sponsorship opportunities under the assumption that G.B. would remain with PDI for the 2023 season, would be a setback that PDI may never recover from.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on  02/15/2023
_____

_____
Mark Anderson
Chief Executive Officer, Prodigy Disc, Inc.

# citrix | RightSignature

## SIGNATURE CERTIFICATE

**REFERENCE NUMBER**
C9F96A68-4F1E-4DE4-8F4A-1C8C0569FFD6

---

**TRANSACTION DETAILS**

**Reference Number**
C9F96A68-4F1E-4DE4-8F4A-1C8C0569FFD6

**Transaction Type**
Signature Request

**Sent At**
02/15/2023 15:31 EST

**Executed At**
02/15/2023 15:37 EST

**Identity Method**
email

**Distribution Method**
email

**Signed Checksum**
e1bd2e7011d79e917f2afa257d86aca1ef7abc9ef52cf47a83782f7e13f16d0b

**Signer Sequencing**
Disabled

**Document Passcode**
Disabled

**DOCUMENT DETAILS**

**Document Name**
Declaration Of Mark Anderson Gb

**Filename**
declaration_of_mark_anderson_gb_.pdf

**Pages**
20 pages

**Content Type**
application/pdf

**File Size**
313 KB

**Original Checksum**
9e51f23e1cdc9e055e4849c101130bbaf938580aec830a37be193a6c9b56d98d

## SIGNERS

| SIGNER | E-SIGNATURE | EVENTS |
|---|---|---|
| **Name**<br>Mark Anderson | **Status**<br>signed | **Viewed At**<br>02/15/2023 15:36 EST |
| **Email**<br>mark@prodigydisc.com | **Multi-factor Digital Fingerprint Checksum**<br>bd710739b54108c1a65ffa80ee15000f1c5959f0524808a1d490eee8c50a8ea9 | **Identity Authenticated At**<br>02/15/2023 15:37 EST |
| **Components**<br>2 | **IP Address**<br>24.4.114.35 | **Signed At**<br>02/15/2023 15:37 EST |
| | **Device**<br>Chrome via Mac | |
| | **Drawn Signature**<br> | |
| | **Signature Reference ID**<br>A6A57868 | |
| | **Signature Biometric Count**<br>3 | |

## AUDITS

| TIMESTAMP | AUDIT |
|---|---|
| 02/15/2023 15:31 EST | Joseph Stuhrenberg (jstuhrenberg@burr.com) created document 'declaration_of_mark_anderson_gb_.pdf' on Chrome via Windows from 173.227.144.2. |
| 02/15/2023 15:31 EST | Mark Anderson (mark@prodigydisc.com) was emailed a link to sign. |
| 02/15/2023 15:36 EST | Mark Anderson (mark@prodigydisc.com) viewed the document on Chrome via Mac from 24.4.114.35. |
| 02/15/2023 15:37 EST | Mark Anderson (mark@prodigydisc.com) authenticated via email on Chrome via Mac from 24.4.114.35. |
| 02/15/2023 15:37 EST | Mark Anderson (mark@prodigydisc.com) signed the document on Chrome via Mac from 24.4.114.35. |

# EXHIBIT 1

## Endorsement Agreement

**ENDORSEMENT AGREEMENT**

 **THIS ENDORSEMENT AGREEMENT** ("Agreement") is made entered into this <u>1st day of January 2022</u> ("Effective Date") by and between Prodigy Disc Inc., a Georgia corporation (hereafter referred to as "PDI"), and ███████████ an individual disc sports athlete residing in <u>Iowa</u> (hereafter referred to as the "Athlete").

 **WHEREAS**, Athlete has experience and expertise in the sport of professional disc golf;

 **WHEREAS**, PDI is engaged in various activities including, without limitation, the manufacturing and selling of its Products and desires to market, distribute and sell its Products incident to the utilization of the Athlete Endorsement;

 **WHEREAS**, PDI and Athlete desire to enter into an exclusive Agreement by which PDI acquires the rights to utilize the Athlete Endorsement of PDI's Products; and

 **NOW THEREFORE** both PDI and Athlete, each intending to be legally bound, and for good and valuable consideration acknowledged, hereby agree as follows:

 **1.** **Definitions.** The terms set forth in this paragraph shall be defined for all purposes under this Agreement as follows:

 a) "Athlete Endorsement" shall mean all personal attributes of the Athlete, including without limitation the Athlete's name, nick-name, initials, autograph, facsimile signature, voice or film portrayals, photographs, likeness and image or facsimile image, and any other means of endorsement or identification by the Athlete reasonably requested by PDI.

 b) "Products" shall include, without limitation, PDI's Products such as golf discs, towels, bags, markers, and apparel.

 c) "Signature Property" shall mean any logos, designs, trade-marks, service marks, characters, personas, copyrights, or other forms of intellectual property created by PDI (and/or its agents) or the Athlete in connection with this Agreement that utilize the Athlete Endorsement and are specifically and exclusively identified with the Athlete. Any such property created by Athlete in connection with this Agreement shall be considered "works made for hire" and shall be the sole and exclusive property of PDI.

 d) "Contract Year" shall mean a twelve-month period from January 1st until December 31st of the same year.

 **2.** **License.** During the Term of this Agreement, Athlete grants PDI the exclusive right and license to use throughout the world, in any media (now known or hereafter created), of the Athlete Endorsement in connection with the advertisement, promotion and sale of PDI's Products, and the exclusive right and license to such use of the Athlete Endorsement in connection with promotional and retail posters and calendars; and sports-themed instructional video products. "Exclusive" shall mean that Athlete Endorsement is vested solely in PDI alone, and Athlete shall not grant the Athlete Endorsement or any endorsement similar thereto to any other person or entity that is a competitor of PDI or works in the disc golf industry during the Term of this Agreement.

**2.1     Athlete's Use of PDI's Products.** The Athlete shall wear and/or use exclusively PDI Products while participating in all disc golf related activities including, but not limited to, all tournaments, games and skill competitions, sports camps, clinics, and in autograph sessions and promotional appearances on behalf of PDI, celebrity or charity athletic events; and any other occasions during which he/she wears a uniform, poses for sports-related photographs, discusses the Athlete's participation in or connection to the Athlete's sport or otherwise engages in his sport or related activities for which the use of PDI's Products is appropriate. Unless otherwise agreed, all visible PDI Products worn or used shall bear PDI's trademark(s)

**3.     Athlete's Other Services.** The Athlete agrees, during the Term of this Agreement, to promote and enhance PDI's Products, trademark(s), goodwill, and further agrees to the following:

a)     The Athlete agrees to use, during all disc golf tournaments and promotional appearances in which the Athlete participates, only PDI Products, and not to use any other competitor products that are the same or similar to PDI Products.

b)     The Athlete agrees to promote and enhance the goodwill of PDI by wearing, when reasonably possible, the apparel, accessories, and all other Products supplied to the Athlete by PDI.

c)     The Athlete acknowledges and agrees that he/she shall not promote, endorse or advertise PDI's competitor products that compete with the Products manufactured by PDI, imported and/or distributed by PDI, and the Products of PDI affiliates. The Athlete agrees to cooperate with PDI and participate in PDI promotional activities, which, in the opinion of PDI, promote and enhance the goodwill of PDI including, without limitation, participation in the making of radio and/or television advertisements and commercials, social media, photography for promotional material, and personal appearances at various events approved by PDI. All such appearances will be at a time, mutually agreed upon by the Athlete and PDI. Further, all such personal appearances by the Athlete shall be in good taste and in no way detrimental to the reputation or image of the Athlete.

d)     The Athlete agrees to endorse and autograph pictures, photos and posters to be used by PDI as promotional material.

**4.     Ownership of PDI's Products.** The Athlete acknowledges that PDI is the sole owner of its Products and owns all rights, titles and interest in and to any and all PDI's Products. This includes, without limitation, any logos, designs, trademark(s), service mark(s), characters, personas, copyrights, patents, trade secrets or other forms of intellectual property created by PDI or the Athlete in connection with this Agreement, including any Signature Property as defined by custom products bearing the Athlete's name or image that is either created or co-created by the Athlete.

**5.     Compensation.** For the Athlete Endorsement and the Athlete's other services as set forth hereunder, PDI shall pay the Athlete compensation in the amounts shown on Schedule A, which is incorporated herein by reference. As part of his/her compensation, the Athlete shall receive an annual disc allotment known as the "Annual Merchandise Credit", which is set forth on the attached Schedule A.  If, in any Contract Year, the Athlete does not exhaust his Annual Merchandise Credit for such year, such unordered portion shall be deemed to have been forfeited; provided, however, this will not apply to ordered merchandise that is unavailable. Any amount over the Athlete's Annual Merchandise Credit may, at the sole discretion of PDI, be set off or deducted from the Athlete's other compensation. The Athlete acknowledges that certain PDI's Products requested by the Athlete as part of his/her Annual Merchandise Credit may not, at the time of such request, be commercially available and that PDI's inability to provide such Products on such occasions shall not be deemed a violation or breach of this Agreement. The

2

Athlete shall be solely responsible for the payment of all federal and state taxes and all other required withholdings on any compensation paid under this Agreement.

**6.    Term of Agreement.** This Agreement shall commence on the Effective Date and shall continue for two (2) years (the "Initial Term"). ~~Thereafter, this Agreement shall automatically renew for successive one (1) year periods (each a "Renewal Term"), unless either party gives the other party written notice of its intention to terminate not less than sixty (60) days prior to expiration of the Initial Term or then current Renewal Term, as applicable. The Initial Term, together with any Renewal Term, constitutes the "Term" of this Agreement.~~

**a)    Termination for Cause.** In the event of any Material Breach of this Agreement, the non-breaching party may terminate this Agreement prior to the end of the Term by giving thirty (30) days prior written notice to the breaching party; provided, however, that this Agreement shall not terminate if the breaching party has cured the breach prior to the expiration of such thirty-day period. The meaning of "Material Breach" includes, without limitation, non-payment of compensation by PDI, Athlete's failure to provide any of the endorsement services set forth hereunder, either party's failure to fulfill any of its obligations hereunder, Athlete's commission of any criminal act, and Athlete's commission of any act which shocks or offends the community or which manifests contempt or disregard for public morals and decency.

**b)    Termination for Insolvency.** Either party may terminate this Agreement, without notice, (i) upon the institution by or against the other party of insolvency, receivership or bankruptcy proceedings, (ii) upon the other party's making an assignment for the benefit of creditors, or (iii) upon the other party's dissolution or ceasing to do business.

**c)    Effect of Termination.** Upon the expiration or sooner termination of this Agreement, all license rights of PDI under this Agreement shall automatically and immediately cease except as follows: PDI may, at its option, continue to use any promotional material, advertising, and/or packaging, as well as any commercial for television or radio release or social media containing the Athlete Endorsement for one hundred eighty (180) days following the date of such termination. Further, PDI shall pay the Athlete compensation up to the date of termination and shall pay Athlete compensation for any period following termination during which the television, radio or other advertising containing the Athlete Endorsement continues. Notwithstanding the foregoing, PDI shall have the right to use in perpetuity and without restriction, videotape, film, digital / social media or photographs containing Athlete Endorsement for historical, educational or commemorative purposes provided that its use is not made available or displayed to the public in any way which may reasonably be interpreted or construed as an Athlete Endorsement of PDI.

**7.    Confidentiality.** The Athlete may disclose the terms of this Agreement to its legal representative, agents or accountants; however, Athlete shall not (nor shall the Athlete permit or cause the Athlete's agents, attorneys, accountants, representatives or employees to disclose) disclose the financial or other material terms of this Agreement, the marketing plans of PDI, or any information related to PDI disclosed to the Athlete pursuant to the terms of this Agreement (collectively "Confidential Information") to any third party, person or entity. Provided, however, that Nothing in this Agreement shall prevent Athlete from disclosing the Confidential Information of PDI pursuant to any judicial or governmental order, provided that the Athlete gives PDI reasonable prior notice of such disclosure to contest such order. The confidentiality provision of this paragraph shall survive the termination or expiration of this Agreement.

**8.    Relationship** The relationship established between the parties by this Agreement is that of independent contractors, and nothing contained herein shall be construed as establishing an employer/employee, partnership or joint venture relationship between the parties or allow a party to create or assume any obligation on behalf of the other party for any purpose whatsoever, except as contemplated by this Agreement.

**9.    Other Endorsement Opportunities.** Subject to the provisions of Paragraph 2 herein, during the Term of this Agreement PDI agrees that Athlete shall retain all rights in and to the Athlete Endorsement, and Athlete shall not be prevented from using, or permitting and licensing others to use the Athlete Endorsement in connection with the promotion, advertisement or sale of any product that is not competitive with PDI Products or violates the intent of this Agreement. In order to avoid misunderstandings and to enhance endorsement activities for the Athlete, the Athlete shall notify PDI of other endorsement opportunities with a view toward cross promotion between PDI and such other advertiser or entity.

**10.    Notices.** All notices and other communications hereunder shall be in writing and shall be deemed effective when delivered by hand, by facsimile transmission, by electronic transmission (i.e. e-mail), or upon receipt when mailed by registered or certified mail (return receipt requested), postage prepaid, to the parties at the addresses below:

To the PDI at:  5211 Mitchell Bridge Road, Dalton, Georgia, 30721

To the Athlete at: ▮▮▮▮▮▮▮▮▮▮▮ Urbandale, IA▮▮▮▮

**11.    Assignment/Delegation.** Neither party may, directly or indirectly, in whole or in part, whether by operation of law or otherwise, assign, delegate, sublicense or transfer this Agreement without the other party's prior written consent, which will not be unreasonably withheld. Any attempted assignment, sublicense, transfer or delegation without such prior written consent shall be made void at the sole option of such other party.  Notwithstanding the foregoing, PDI may assign or transfer this Agreement as a whole without consent to an entity that succeeds to all or substantially all of the business or assets of such party.

**12.    Waiver.** The failure at any time of either party to demand strict performance by the other party of any of the terms or conditions of this Agreement shall not be construed as a continuing waiver or relinquishment thereof, and either party may, at any time, demand strict and complete performance by the other party.

**13.    Set-off.** Each party to this Agreement shall have the right to set-off any amounts owed by the other party, hereunder or otherwise, against any amounts owed by such party.

**14.    Severability.** If any provision of this Agreement is held to be invalid or unenforceable under the circumstances, such provision's application in any other circumstances and the remaining provisions of this Agreement shall not be affected thereby.

**15.    Dispute Resolution.** The Parties agree that it is in their mutual interest to resolve disputes informally.  A claim by PDI shall be submitted in writing to Athlete for decision.  A claim by Athlete shall be submitted in writing to PDI for decision. The Parties shall negotiate in good faith and use all

4

reasonable efforts to resolve such dispute(s). During the time the Parties are attempting to resolve any dispute, each shall proceed diligently to perform their respective duties and responsibilities under this agreement. If a dispute cannot be resolved between the Parties within fifteen (15) days after delivery of notice, either Party may elect to exercise any other remedies available under this agreement, or at law. This clause shall not constitute an agreement by either Party to mediate or arbitrate any dispute nor shall it limit any other remedy a Party may have at law or in equity.

**16.    Governing Law and Jurisdiction.** This Agreement is governed by the laws of the State of Georgia, U.S.A. without regard to any provision that would make the laws of another jurisdiction applicable. The federal and state courts sitting in Woodstock, Georgia, U.S.A. shall have proper and exclusive jurisdiction and venue with respect to any disputes arising from or related to the subject matter of this Agreement. The prevailing party in any such disputes shall be entitled to recover their legal costs including, without limitation, attorney's fees.

**17.    Entire Agreement.** This Agreement, and the Schedules and Exhibits attached hereto, constitutes the complete and exclusive agreement of the parties and supersedes all prior understandings and agreements, whether written or oral, with respect to the subject matter hereof. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement shall be effective unless in a writing signed by both parties hereto.

**18.    Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same agreement.

**IN WITNESS WHEREOF**, the parties have entered into this Agreement as of the date set forth below.

**PRODIGY DISC, INC.**

Name: Michael Sullivan
Title: President

**ATHLETE**

Name:

**Name Michelle Nesheim** (Legal Guardian)

**Schedule "A"**
**Athlete's Compensation**
**Compensation for the Contract Year(s) ("Contract Year" as defined in the Agreement) is as follows:**

5



## 2022/2023 CORE TEAM SPONSORSHIP



Athlete is eligible for bonuses if Athlete uses PDI products during the entirety of the competition. Logo on discs and shirts/outerwear must be entirely visible during the competition under which the bonus is earned.

**Right to extend,**

During the Contract Period and for a 180-day period thereafter, PDI shall have a right of first refusal with regard to any bona fide third-party offer received by Athlete and which Athlete desires to accept. Athlete shall submit in writing to PDI (on 3rd parties letterhead) the specific terms of any such offer.

PDI shall have ten (10) business days from the date of its receipt of such third-party offer to notify Athlete in writing if it will enter into a new contract with Athlete on terms no less favorable to Athlete than the material, measurable and matchable terms of such third-party offer.

If after receiving the matching offer the player still wants to leave the contract, Prodigy will release the player from this agreement at the end of the term of this agreement.

**PLAYERS WILL RECEIVE BONUSES FOR THE FOLLOWING:**

**Bonus Structure:**

**\*Does not include DGPT silver series or special events**

7

PLAYERS ARE REQUIRED TO:

1.      Wear only Prodigy Disc apparel and play with Prodigy Discs

2.      Have the Prodigy logo be the sole logo on apparel during play, awards ceremonies, demos, events and interviews on and off the course

3.      Post about Prodigy products at least 2 times per week

4.      Attend all award ceremonies

5.      Agree to the Prodigy Disc code of conduct

6.      Participate in 20 PDGA sanctioned tournaments per year

7.      Be available at least 1 hour per day at all National Tour, DGPT, PDGA Worlds and to participate at two major Amateur events, to assist with the "Prodigy Market" and participate in clinics as required.

Prodigy Disc will promote all Prodigy Disc players to dealers looking to host clinics, signings or demonstrations. All Prodigy Disc players offering their time will be given equal consideration and will be compensated for such appearances.

Prodigy Disc will, to the best of its ability, participate in sponsorships of tournaments run by Prodigy team members on a case-by-case basis.

Prodigy Disc will try to support players with their disc golf promotion and growth initiatives.

Prodigy Disc Team members are not allowed to sell their personal allotment discs.

Prodigy Disc reserves the right to use a sponsored athlete's name, signature, photograph, video footage, likeness, and other information for sales marketing and promotional purposes. Prodigy Disc may also continue to use your name, signature, photograph, video footage, likeness, and other information that is already in print and or in circulation even after the expiry or termination of the athlete's contract. Prodigy Disc will cease to distribute these promotional materials once replacements have been released.

I, _____ have read and agree to the above Code of Conduct.
     (Print Name)

_____      12/16/21
    Player Signature           Date

**We look forward to working together with you!**

# EXHIBIT 2

## Termination Notice

Begin forwarded message:

**From:** ███████████
**Subject: Prodigy concerns 2022-2023**
**Date:** January 13, 2023 at 11:33:30 AM AST
**To:** @prodigydisc.com

Michael,

For more than a year and a half, I have reached out to you through texts, messaging and we've had multiple zoom calls where I discussed my concerns with Prodigy. I feel that instead of seeing anything resolved, I continue to see promises but nothing changes. I have been patient and loyal to the company, still promoting Prodigy and hoping I would see solutions to my concerns. I don't understand why Prodigy continues to promise things to me that it can't fulfill, but this is a constant theme of our communications. Unfortunately, I have no other way to express my frustration to Prodigy and its Board of Directors. I hope you will forward this communication to any relevant decision makers at Prodigy.

The following is a list of the material breaches Prodigy has made in its relationship with me:

- I was awarded the PDGA Rookie of the Year for 2021 on December 31, 2021. For my contract that year, I should have received a disc celebrating the award in early 2022, which makes this a breach of Prodigy's obligations to me in 2022. This would have been an impactful way to start 2022 with publicity and support from Prodigy. Not only could I have earned money selling the discs that I was entitled to receive, sales on the website would have earned me commissions as well.

In late November and early December 2021, we exchanged several messages on Facebook Messenger and texted about the ROY disc ideas. I sent a mock-up of the stamp I would have liked. You even said I could have two discs for this since Luke Humphries did when he won ROY. Nothing ever became of it.

Of course in 2022, when Isaac Robinson won DGPT Rookie of the Year, he received a commemorative disc less than a month after he won the award. I have not received an explanation why my accomplishments were treated differently than other Prodigy ROY winners. Even if Prodigy produced these discs now, the benefits I would have gained, financially and otherwise, and the opportunity to showcase my accomplishment in a timely manner are gone.

- From 2021, when my previous contract was signed through 2022 and now into 2023, we have asked consistently and repeatedly to receive regular sales reports of my disc sales to reconcile with my commissions. My Mom and I were told that we could see those at any time, but they had never been sent to us, even though Prodigy knew that was very important for us to have. Finally on January 10, 2023, I did get a report but I am not confident the numbers are correct. It looks like some of Luke's D3 sales were included in my payout and I am not confident the report shows all discs sold with my name on them. We need a full accounting of all Prodigy discs sold in 2022 so that we can determine

the commissions that are owed to me and ensure Prodigy accounting is correct.

- In early 2022, my Signature Series Disc, the D1, was released for sale. I did not get the opportunity to choose which disc I preferred. In text messages throughout November 2021, we talked about which disc I would get and you said I would get the D1 that was "assigned" to me. You also promised me that I would receive two signature discs. Even though I was promised two signature series discs, I only received one. This greatly diminished my potential income from disc sales and the damages to me from this are almost impossible to calculate. It would have been helpful to have a second Signature Series disc mid-year to keep my name in front of everyone while I continued to perform well on the Tour. It's safe to say that Prodigy could have more than doubled my commissions by releasing additional discs it promised to me.

- Prodigy is releasing new disc molds that are called the same as other discs Prodigy makes.  The PA-3s I have been sent recently are not the same as the PA-3s I used to win the USDGC. When I asked Will Schusterick, he told me it was the same mold as normal. Maybe he was not sure they were different or not. You admitted to me that it was a different mold. I have no confidence in these discs and it's very frustrating to think I can't even putt with the discs with my name on them.

On social media, people are calling this out as well. They have noticed they are not the same as the PA-3s as before. A large part of my potential income is commissions from disc sales. I have had concerns about the quality control and lack of consistency in the discs that are being sold by Prodigy. As far back as June 2021, I texted you with serious concerns about the extreme flashing and issues regarding consistency. You claimed it would be fixed six weeks from that date in June. Unfortunately, Prodigy continues to have quality control issues and flashing.

As recently as this past weekend of January 7-8, 2023, I received over 100 discs from Prodigy to sell at a disc golf clinic in Kansas. Many of them had to be removed because the flashing was so severe on them that it would not have been right to sell them. Some were overcut to the point there were jagged edges on them. People could have cut their hands on them. I can't have my name attached to anything that is of inferior quality to the point it can't even be thrown. Because of this poor quality and lack of consistency, I am losing disc sales commissions.

Although people may initially buy them, they will not be repeat buyers. Social media shows comments recently made regarding people moving away from Prodigy because of these issues. Other people have posted that they are having a hard time finding Prodigy because their local shops have stopped carrying Prodigy. This is not a new issue and it has not been fixed. I am not being provided with the right products to sell and promote, which is a huge part of the compensation in my agreement.

- Prodigy never paid me the $300 I am due for PDGA points and $200 from PDGA player rating standings.

Under our agreement Prodigy has 30 days from today, January 13, 2023, to cure the above alleged breaches of our agreement. I will notify Prodigy at the end of the 30-day period whether, in my determination, the breaches have been sufficiently cured. If they have not been cured, I will terminate our agreement effective immediately, as the agreement allows me to do.

I do not want to have to be distracted by these issues during the season. I hope that I will soon be able to focus on disc golf instead of having to constantly ask for things I am entitled to under our sponsorship agreement.

Respectfully,

█████

# EXHIBIT 3

## PDI Response to Termination Notice



**ALEX M. CAMPBELL**

ACAMPBELL@FBFK.LAW
OFFICE (972)378-9111
FAX (972) 378-9115

February 7, 2023

***Via Email:*** 

Michelle Nesheim

     Re:    Exclusive Relationship Discussions between Prodigy Disc Inc. and
████████████

Mr. ████ and Ms. Nesheim,

      We have been retained by Prodigy Disc Inc. (**"PDI"**) to represent them regarding discussions related to your Exclusive Endorsement Agreement (the **"Agreement"**) with PDI and your email complaint on January 13, 2023. Moving forward, we ask that you please direct all communications regarding this matter to me. Furthermore, if you are represented by counsel, please let me know, and provide me with the name and contact information of said counsel, and I will stop all direct communication with you and speak directly to your attorney.

      The purpose of this letter is to respond to your January 13, 2023, email to PDI expressing your frustration with the company, which we interpreted as your attempt to provide a notice to cure under Section 6(a) of the Agreement. First, I am sure I speak on behalf of everyone at PDI when I express sincere regret and confusion that your relationship has reached this point, given the Parties' successful relationship over the years. PDI has never intended to slight you or otherwise cause you to feel unappreciated by the company.

      Because PDI truly values its relationship with you, it asked me not to fully delve into the merits of the items raised in your email, as we believe it would only generate hostility between the Parties. However, I would not be fulfilling my duties if I did not address and clarify some of the points raised in your initial correspondence. First and foremost, PDI expressly denies any allegations you have raised regarding the purported diminished quality of its products and refutes any allegations regarding a faulty design of the discs.

      PDI stands by its products and takes pride in the care devoted to creating discs of the utmost quality for your top performance. We are troubled and confused by your sudden issue with the quality of these products that have brought you such great success thus far in your career and hope this concern was not fabricated merely as an excuse to avoid your duties under the Agreement. Furthermore, regardless of the

**FERGUSON BRASWELL FRASER KUBASTA PC**

February 7, 2023
Page 2

quality of PDI's products, these meritless allegations regarding the disc quality do not constitute a "Material Breach" as defined in the Agreement. As such, these grievances do not constitute grounds to terminate the Agreement for Cause.

Additionally, PDI wants to assure you that the financial figures provided on January 10, 2023, regarding your sales were completely accurate. We acknowledge that some of Luke's sales were on the report, but this was a clerical oversight and did not impact your commission. Those sales did not account into your payout. When preparing the report for you to review, there was carryover from your sales to Luke's, and some of Luke's sales were copied along with yours when preparing the report. We are more than happy to continue providing an updated report of your sales records as you requested, or even agree to a scheduled generation of reports. Please advise as to your preference.

Finally, it is my understanding that all financial compensation to which you are currently entitled has been paid. PDI fully intends to properly compensate you for future amounts accrued throughout the duration of this Agreement, and further intends to fully comply with any additional terms that may be negotiated between the Parties. Based on these findings, we maintain that PDI has not committed a Material Breach of the Agreement to justify any premature termination and intends to fully enforce the Agreement throughout its entire duration.

Given your history, PDI truly hopes that the Parties can resolve whatever lingering issues you believe exist so that you both can have a long and prosperous relationship throughout your career. However, should you opt to not honor your commitments to PDI currently existing, I must advise you that PDI intends to vigorously enforce its rights under the Agreement, including seeking any legal remedies through the courts that are available should you attempt to, or indeed actually breach, the terms of the Agreement. Should you opt not to honor these commitments, PDI will be forced to pursue any remedy available to prevent or otherwise recover for the injuries caused by your breach.

As a reminder, your commitments to PDI under the Agreement include, most notably, the following: (i) neither you, nor any of your representatives may disclose the financial and material terms of the Agreement to other parties; (ii) during the term of the Agreement, and for 180 days thereafter, you shall submit to PDI, in writing, any third-party offers you may receive for similar endorsement arrangements from other companies, after which PDI may offer you a new contract on no less favorable terms.

Again, PDI regrets that your relationship has gotten to this point, particularly as we were under the impression that there have been no major issues. PDI has enjoyed partnering in your ascent through the professional disc golf field and is

**FERGUSON BRASWELL FRASER KUBASTA PC**

February 7, 2023
Page 3

thankful to have been a part of the ride thus far, but will not hesitate to protect its interests in the event you do not wish to comply.

Should you have any questions, you may contact my office to discuss. Your attention to this matter is appreciated.


Respectfully,


Alex M. Campbell

# EXHIBIT 4

## February 13 Termination

# PARKER MACINTYRE

## ATTORNEYS

J. Steven Parker, Partner
Patricia Klusmeyer, Partner
Robert D. Terry, Of Counsel
Katherine Oberlies, Associate

Bryan Gort, Partner
Daniel I. MacIntyre, Of Counsel
Charlie Jarrett, Senior Associate

Sender's Email: bgort@parkmac.com

February 13, 2023

**Via Email ACAMPBELL@FBFK.LAW**

Alex M. Campbell
Ferguson Braswell Fraser Kubasta PC
2500 Dallas Parkway
Suite 600
Plano, TX 75093

Re: Material Breaches of ███████'s Contract

Dear Mr. Campbell,

I have been retained by ███████ to represent him in his Material Breach allegations against Prodigy Disc Inc. ("PDI"). Please direct all future correspondence on this matter to me.

The contract Mr. ████ signed with PDI on December 16, 2021 ("Agreement"), provides that he can terminate the Agreement if Prodigy "Material[ly] Breach[es]" the Agreement. "Material Breach" is defined as "without limitation, non-payment of compensation by PDI, Athlete's failure to provide any of the endorsement services set forth hereunder, either party's failure to fulfill any of its obligations hereunder, Athlete's commission of any criminal act, and Athlete's commission of any act which shocks or offends the community or which manifests contempt or disregard for public moral and decency."

Under the Agreement, PDI has 30 days to "cure" any Material Breach that is alleged. The Agreement, which was drafted by PDI is deficient in that it does not have a metric to determine whether a "cure" is effective. Mr. ████ has provided PDI with a full 30 days since his notice of Material Breaches to PDI on January 13, 2023. Unfortunately, and as you admit, PDI has not "cured" all of the Material Breaches alleged by Mr. ████.

The purpose of this letter is also to respond to your claims and to explain Mr. ████'s current positions. A few of the statements and characterizations you made in your letter of February 7, 2023, are inaccurate and I will take this opportunity to correct them here.

You indicate that you assume that the purpose of Mr. ████'s letter of January 13, 2023, is "to provide a notice to cure under Section 6(a) of the Agreement." Mr. ████'s letter is notice to PDI of Material Breaches of the Agreement that PDI has committed. We assume that your letter of February 7, 2023, is an attempt to "cure" the Material Breaches of the Agreement that Mr. ████ has alleged. The following are the Material Breaches that Mr. ████ has alleged and responses to any arguments PDI has made as to how it has "cured" these Material Breaches:

LAW OFFICES

# Parker MacIntyre

1. Under the Agreement, Mr. ████ was due 100 rookie of the year discs after his rookie of the year win which was announced on December 31, 2021. Payment by PDI of the rookie of the year discs Mr. ████ earned was due in early 2022. There are several text messages between Mr. ████ and Michael Sullivan regarding the design of this rookie of the year disc, so this allegation should not be a surprise to PDI. Mr. ████ never received the 100 rookie of the year discs he was due. Here is a text message conversation between Mr. ████ and Mr. Sullivan regarding these rookie of the year discs that PDI never produced:



The only discernable response to this Material Breach allegation in your letter of February 7, 2023, is that, "it is my understanding that all financial compensation to which you are currently entitled has been paid." As I mention above, the Agreement defines Material Breach as, "without limitation, non-payment of compensation by PDI." In the Agreement, does not limit Material Breach to simply "financial compensation." In fact, the majority of financial compensation Mr. ████ receives is from "special edition disc commission[s]."

Further proof that Mr. ████ did not receive the compensation he was entitled to under the Agreement is in the document PDI provided to Mr. ████ regarding commission sales of his discs. In that document, you can see that Mr. ████ did not receive ANY commission compensation for discs in January and February of 2022, when Mr. ████ needed proceeds from rookie of the year discs to seed his travel and tournament money for the 2022 season.

As Mr. ████ pointed out to PDI, previous and current rookies of the year from PDI have not been treated the same way Mr. ████ has been treated. Mr. ████ even went above and

LAW OFFICES

# PARKER MacINTYRE

beyond his requirements and designed a stamp himself, which Mr. Sullivan indicated he would work on but never did:



After over a year asking PDI for the compensation Mr. ▮▮▮ was due, it is surprising to us that PDI decided to "not to fully delve into the merits of the items raised in your email." Nothing in your letter responds to these allegations. This Material Breach is grounds for terminating the Agreement and has not been cured by PDI in the given 30 days. We will not grant any additional time for PDI to create a "cure" for this Material Breach nor will we review any additional "cures."

2. Since 2021, Mr. ▮▮▮ has been requesting sales reports from Mr. Sullivan so he can verify the commissions paid by PDI are accurate. As you agree in your letter, the sales report that Mr. ▮▮▮ has been provided was inaccurate. PDI still has not cured this Material Breach in that it has not sent Mr. ▮▮▮ an accurate sales report so he can determine whether PDI has compensated him properly. Your response did not cure this Material Breach.

3. Under the Agreement, Mr. ▮▮▮ was due a signature disc in 2022 which he received. As Mr. ▮▮▮ has not been shy about his issues with PDI for the last year or more, Mr. Sullivan agreed via text message to further compensate Mr. ▮▮▮ with an additional signature disc in November 2021 to increase the amount of compensation Mr. ▮▮▮ would receive.

3

LAW OFFICES

# PARKER MACINTYRE

Mr. ▆▆▆ relied on the text message promise of Mr. Sullivan to his detriment as it was one of the reasons Mr. ▆▆▆ signed a new contract with PDI shortly thereafter. Here is the text message where Mr. Sullivan promises this additional compensation to Mr. ▆▆▆:



Mr. ▆▆▆ lost direct compensation from PDI's decision to promise him an extra signature disc and then not fulfill that promise. In your letter you indicate the following about PDI's intentions regarding any ancillary agreements between PDI and Mr. ▆▆▆, "PDI fully intends to properly compensate you for future amounts accrued throughout the duration of this Agreement, and further intends to fully comply with any additional terms that may be negotiated between the Parties." PDI has not complied with the additional terms negotiated above and this has directly reduced the amount of compensation Mr. ▆▆▆ received in the year 2022. Nothing in your letter responds to these contentions and PDI has been on notice about this issue for well over a year, so it could not be a "surprise" as you indicate.

4. PDI has major issues with the consistency of its discs including but not limited to changing the actual shape of the disc from year to year. Mr. ▆▆▆ has brought these issues up to PDI countless times and was promised in June 2021 that they would be fixed in relatively short order. This is not a "sudden issue," and we have plenty of correspondence to provide to show this has been brought up to PDI previously and not pre-text to terminate the relationship.  Here is a text message from ▆▆▆ to Mr. Sullivan in in June 2021 regarding these issues:

4

LAW OFFICES

# PARKER MACINTYRE



To date, PDI has not fixed these issues with its discs produced in Georgia even though it admitted that the discs have changed. Mr. ▇▇ cannot use the new putters that PDI is producing as they are different from the putters he used to win the United States Championship. This causes issues with both Mr. ▇▇'s performance and his ability to market the discs PDI makes as he does not want to lie to consumers about the changes PDI has made. This change has Breached the terms of the Agreement as Mr. ▇▇ cannot market the discs to consumers that PDI currently makes.

5. I want to acknowledge that PDI cured Material Breaches related to the $300 for PDGA points and $200 from PDGA player rating standings. This is the only Material Breach of the Agreement that PDI cured during its 30 day time window to cure all Material Breaches alleged by Mr. ▇▇.

Mr. ▇▇ indicated the following in his January 13 correspondence:

> I will notify Prodigy at the end of the 30-day period whether, in my determination, the breaches have been sufficiently cured. If they have not been cured, I will terminate our agreement effective immediately, as the agreement allows me to do.

Based on your letter of February 7 and the above analysis, PDI has not cured the Material Breaches Mr. ▇▇ has alleged. Mr. ▇▇ is terminating his Agreement with PDI effective immediately.

You indicate in your letter that under the Agreement, Mr. ▇▇ is required "to submit during the term of the Agreement, and for 180 days thereafter, you shall submit to PDI, in writing, any third-

LAW OFFICES

# PARKER MACINTYRE

party offers you may receive for similar endorsement arrangements from other companies, after which PDI may offer you a new contract on no less favorable terms." Your analysis is missing an important component from the Agreement, which is the following language, "[i]f after receiving the matching offer the player still wants to leave the contract, Prodigy will release the player from this agreement at the end of the term of this agreement."

While Mr. ███ has not signed with another disc golf company yet, this provision negates any need to provide PDI with any future contract offers Mr. ███ received because the Agreement with PDI already terminated. This means that even if PDI wanted to match an offer Mr. ███ receives in the future, PDI has no mechanism to bind Mr. ███ since his Agreement with PDI has already terminated.

Since the season is about to begin, Mr. ███ has no interest in future negotiations with PDI as PDI has had 30 days of exclusive time to cure these breaches. As Mr. ███ indicated in his letter of January 13, "I do not want to have to be distracted by these issues during the season. I hope that I will soon be able to focus on disc golf rather than having to constantly request things I am entitled under our sponsorship agreement."

We wish PDI the best of luck in its future endeavors and hope that both parties can make social media separation posts about each other that are positive. Regardless, Mr. ███ will be publicly announcing the termination of his Agreement with PDI today.

Sincerely,

Bryan W. Gort

6

# EXHIBIT 5

## Compendium of Public's Reaction to G.B.'s Announcement





11:08

‹   **Nick's post**   •••

**Nick Staab**
What's the point of a contract if everyone can just leave whenever they want to

1h   Like   Reply   7 👍😆

**Alex Neumann**
Nick Staab he had one year left and whoever signed him would have to buy out the remainder of his current contract

45m   Like   Reply   1 👍

**Jordan Roppolo**
Alex Neumann literally how all Sports management goes with contracts.

1m   Like   Reply

**Alex Neumann**
Jordan Roppolo ya I'm explaining it to this dude

Just now   Like   Reply

Write a reply...

**TJ Thurman**
Nick Staab They can't...that's how contracts work...unless

Write a comment...   😀 GIF 🙂

🏠 Home   ▶ Watch   ♡ Dating   ◉ Profile   🔔 Notifications (9+)   Menu

3

11:08

< **Nick's post** ···

there is a buyout or exit clause...

<.<

43m   Like   Reply

**Kevin L Powell**
**Nick Staab** thank you!!!

34m   Like   Reply

**Nick Staab**
I no someone had to buy him out but he still had a year you couldn't finish a year why not just start doin year long contracts for everyone it just don't seem right that people are leavin b4 there contracts are up

32m   Like   Reply   1 👍

Write a reply...

**Josh Callaway**
basically, be a man of your word. If you sign a contract you are giving your word that you are going to uphold it.  Frustrating to see how common this behavior is in our world today. Not just disc golf. Integrity...

9m   Like   Reply   1 👍

Write a comment...   😮 GIF 🙂

🏠 Home   ▶️ Watch   ♡ Dating   👤 Profile   🔔⁹⁺ Notifications   Menu

4



11:25

# Comments

**kprime316** 3h

So sick of the non-committal attitudes once something better comes along. They've had your back since day one, and you just re-signed with them. Maybe stick it out and stay committed instead of being greedy. Be careful that your socks don't catch on fire from the bridge that's burning behind you.

2 likes    Reply

View 4 more replies

**kyle.eberdt.dg** 4h

Prodigy in shambles right now

34 likes    Reply

View 1 more reply

**shadowsora_dg** 3h

Uh oh, taking the simon payout money and going to discmania??? @brianmedley @dylan_fltlns

1 like    Reply

View 2 more replies

**chriisstopheerrr** 3h

Discmania 💯

❤️    🙌    🔥    👏    😢    😍    😮    😂

Add a comment for gannon_...

5

3:42
◀ Search

# Comments

**hype_discgolf** 8h
You have a bright future in disc golf anywhere you go.  Any manufacturer would be lucky to have you huck their discs.  Go take care of business! Show them what the Hype is all about!  Keep up the great content as well.

1 like   Reply

**itsgillygilll** 3h
but you are on the verge of an amazing career, you should have received a much bigger contract after last year, you'd look good in a DM Jersey!!!

Reply

**jackson_g_dg** 2h
Are you going to discmania to replace Simons spot as a crush boy

Reply

**mooner_21** 7h
MVP? Gonna be one the Gy-bros? Can't see it with the deal SL got but I'd love to see ya throw them discs for sure!

1 like   Reply

❤️  🙌  🔥  👏  😢  😍  😮  😂

Add a comment for gannon_...

6



3:45
◀ Search

# Comments

**forgesportsmedia** 7h
Absolutely wild news! Excited for your season, Gannon! 💪🚀
Reply

**scottybliving** 7h
@prodigydisc can kick rocks
Reply

**dexter2vicious** 7h
Discmania get your popcorn ready 🔥🔥
Reply

**jared.boothe.1** 7h
@discmaniadiscs needs a new crush boy!
Reply

**_camlong** 7h
If innova doesn't scoop him they're idiots
Reply

**scottybliving** 7h
I all of a sudden love Gannon!  Get some buddy!!
Reply

❤️   🙌   🔥   👏   😢   😍   😮   😂

Add a comment for gannon_...



⬆ 5 ⬇   💬 Reply

**Selerox**  MVP/Axiom/Latitude64 · 6 hr. ago  ⋯

Begs the question, do they even have a future? They can't get or keep players, and their products are poor selling and have a dubious reputation.

⬆ 3 ⬇   💬 Reply

**VSENSES**  Team GlitchBit... · 6 hr. ago  ⋯

Who knows. I could honestly see them gone in a few years or they'll change up somehow. Finland is a pretty big nest for Prodigy, they sell tons of discs there and they have very talented and likeable players.

I do think they need a major overhaul, new management or something. They need to go thru the resurgence that Discraft did when they got McBeth. Went from anold fashioned brand to the hottest brand in the sport (arguably).

⬆ 3 ⬇   💬 Reply



 **crazyg0od33** · 8 hr. ago
MVP | Axiom | Pilot

You think he'd leave without already having a sponsor lined up?

I mean it's possible but I don't think he'd just go out on his own without one, so I'd assume he'd have a sponsor before then. Though I guess he could get one before the season starts and throw whatever at all stars. Just would seem odd

⬆ **7** ⬇  💬 Reply  Share  Report  Save  Follow

 **3lobed** · 8 hr. ago
understable but fighting the wind

He probably has something lined up but finalizing contracts and whatnot takes time plus he may have a cool down period with Prodigy where he has to wait X number of days before he can have a new disc sponsor. Or maybe he doesn't have anything lined up. Pretty much every company would sign him to pretty much whatever number he tells them.

⬆ **3** ⬇  💬 Reply  Share  Report  Save  Follow

 **_echo** · 7 hr. ago

If I were a sponsor signing him this close to the start of the season I'd give him a reducing open bag deal and tell him he can start the season throwing basically whatever he wants and by the end of the season I'd expect it to be mostly my discs. If I'm DM and I sign him and he wins LVC with a still mostly prodigy bag cause he was only signed a few weeks ago, he's still doing it with my name on his shirt, and everyone sees that the new guy was classy enough to let him swap the bag over time, and that his success was just as important to his sponsor as what discs he was throwing.

He is also an obsessively diligent practice putter, so if he's had this lined up for a while then he's probably been practicing with the new discs all winter in his basement and has his putting figured out.

⬆ **10** ⬇  💬 Reply  Share  Report  Save  Follow

**bewrong23** · 4 hr. ago

Someone (his new sponsor) would have had to buy him out of his Prodigy contract

⬆ **1** ⬇  💬 Reply  Share  Report  Save  Follow

**10**

# EXHIBIT 6

## February 22 iMessage Exchange

   

2/13/22, 12:48 PM

 Got the D1s, the stamp looks sick and the colors are awesome. The thing is they are super flippy for a D1. Not sure if these ones just came out weird but I thought I'd let you know. They do bomb so I'll probably throw them for that shot haha

2/23/22, 9:49 PM

Hey

I just returned from Europe.

I hope all is well.

Yep! Those D1s bomb! Threw one 672 yesterday!

That is good news.

There are a lot of new discs in the next 60 days

They feel awesome too.

 Like what?

over stable mids

Haven't thrown the Fx4 but it feels awesome

Let's go!

 The distortion went straight into my bag  

Good news

Good luck tomorrow.

We are cheering for you.